369 F.2d 874
 Marion J. BERGUIDO, Individually, Marion J. Berguido, Robert G. Rowe and Warren H. Woodring, Executors of the Estate of Carlos Berguido, Jr., and June Berguido, Joy Berguido, Jill Berguido and Carlos Berguido, 3d, by Their Guardian Marion J. Berguido, Appellants,
v.
EASTERN AIR LINES, INCORPORATED.
 No. 15156.
 United States Court of Appeals Third Circuit.
 Argued September 16, 1965.
 Decided November 23, 1966.
 
 Seymour I. Toll, and Charles A. Lord, Philadelphia, Pa. (B. Nathaniel Richter, Arthur G. Raynes, Richter, Lord, Toll & Cavanaugh, Philadelphia, Pa., on the brief), for appellants. Truscott, Kline, O'Neill & Howson, Philadelphia, Pa., of counsel.
 F. Hastings Griffin, Philadelphia, Pa. (Owen B. Rhoads, Dechert Price & Rhoads, Philadelphia, Pa., on the brief) for appellee. Daniel L. Stonebridge, John J. Martin, New York City, of counsel.
 Before BIGGS, Chief Judge, and KALODNER and FORMAN, Circuit Judges.
 OPINION OF THE COURT
 FORMAN, Circuit Judge.
 
 
 1
 This is the second appeal to reach us in the wrongful death action brought by appellants in the United States District Court for the Eastern District of Pennsylvania, individually, as guardian and as executors of the estate of the deceased, Carlos Berguido, Jr. [hereinafter referred to as plaintiff, plaintiff-appellant, and appellant], against Eastern Air Lines [hereinafter referred to as defendant, defendant-appellee, and appellee]. Decedent was a passenger for hire on a constellation that crashed near Imeson Airport, Jacksonville, Florida in the early morning of December 21, 1955.
 
 
 2
 Following two mistrials, a third trial, before a jury, resulted in a verdict for plaintiff. The jury found that the crash was the result of one or more acts of wilful misconduct on the part of the defendant. Defendant's attempt to limit its liability to $8300 under the Warsaw Convention[1] governing international airplane flights was thus defeated.[2] We reversed on evidentiary grounds.[3]
 
 
 3
 A fourth trial, before a jury, produced a verdict for plaintiff, but only for the limited Warsaw Convention liability of $8300, this jury resolving the issue of wilful misconduct adversely to the plaintiff. However, upon plaintiff's motion, the District Court vacated its judgment and granted a new trial.[4] Defendant applied to this court for a writ of mandamus and prohibition, arguing that the District Court had exceeded its power in granting the new trial. We denied the writ[5] as well as a petition for reargument.[6]
 
 
 4
 The case was then scheduled for its fifth trial. The posture of the case was as it was at the previous trials. Defendant, having pleaded the Warsaw Convention, was attempting to limit its liability to $8300,[7] while plaintiff's main efforts were directed at proving either that the decedent's flight was not international, or that defendant was guilty of wilful misconduct so as to otherwise eliminate the Warsaw Convention defense. The plaintiff had presented alternate theories of defendant's wilful misconduct. It was urged by plaintiff that the pilot of the Eastern constellation had attempted a "sneak-in" landing — dropping down through a low cloud ceiling into a position below the authorized Instrument Landing System (ILS) approach minimum elevation. This theory was developed by plaintiff through the presentation of hypothetical questions to experts, Glickstein, Kepner and Cann. Plaintiff's alternative theory was that both the pilot and the co-pilot operating the aircraft had submarginal heart conditions. Medical records were introduced in support of this theory.
 
 
 5
 Plaintiff alleges that it also urged that defendant had not met its obligations under Article 3(1) of the Convention[8] and, thus, the Convention did not apply. Plaintiff appears to indicate that the District Court was thus urged in the alternative to try the case on the theory of simple negligence.
 
 
 6
 The parties waived trial by jury. They also agreed that the District Court need not enter findings of fact and conclusions of law, which are required by Federal Rule of Civil Procedure 52(a) in non-jury cases. The parties further specified that the District Court might limit its decision to a general finding either for or against liability and in a single total sum fixing damages, just as a jury would do. Despite the acquiescence by the parties to a short form of disposition, not authorized by the Federal Rules, the District Court did file an opinion[9] in which it set forth findings of fact on certain aspects of its ruling.
 
 
 7
 Summarily determining the international nature of the flight, a finding which the plaintiff does not now contest, the bulk of the District Court's opinion is devoted to a discussion of whether the defendant was guilty of wilful misconduct. A discussion of whether defendant complied with Article 3(1) of the Warsaw Convention is absent, although the Convention was determined to be applicable. The District Court observed that this was a case where the evidence of wilful misconduct was meager and incomplete, making the search for truth a most difficult task. It stated that a considerable number and variety of causes of the accident were within the realm of possibility. The District Court observed further that in a case such as this, where the search is for the cause of the accident, the judgment of a court must be determined upon the probabilities insofar as they can be determined from the evidence, and not on a mere possibility, even if such possibility be disclosed by the evidence.
 
 
 8
 The above preliminary observations were followed by a statement of "firm findings" which the District Court apparently considered facts found "specially" conforming to the requirement of Federal Rule of Civil Procedure 52(a). The District Court found that there was not a preponderance of credible evidence that a health condition constituted wilful misconduct causing or contributing to the crash of the constellation. As to the "sneak-in" theory, the District Court stated that it could not find as proven by the preponderance of the evidence all of the assumed facts stated in the hypothetical questions put to plaintiff's experts. But, even if all the assumed facts were taken to be proven, said the District Court, the conclusions reached by plaintiff's experts were not believable. Rather, the District Court chose to find that there was a substantial and reasonable probability that the presence of jet aircraft in or near the ILS glide slope for the Eastern constellation interfered with the aircraft, bringing about emergency conditions resulting in the accident, the theory of the defendant. The Court then concluded that defendant was guilty neither of wilful misconduct nor of negligence. Having previously found the Warsaw Convention applicable, judgment was entered against the defendant for $8300. Though finding against defendant's liability above $8300, the District Court indicated, albeit quite unnecessarily, that plaintiff had suffered $375,000 in damages.
 
 
 9
 — I —
 
 
 10
 Prior to examining plaintiff-appellant's position on this appeal, a question of some moment is whether the District Court complied with Federal Rule of Civil Procedure 52(a). The agreement between the parties, that the District Court need not enter findings of fact, is not effective. The requirement of Rule 52(a) is mandatory, the findings in part serving as a necessary aid to the appellate courts.[10] If a full understanding of the factual issues cannot be gleaned from the District Court's opinion, we would be obliged to remand for compliance with Rule 52(a).
 
 
 11
 Were the findings, as prepared, sufficient compliance with Rule 52(a)? Concerning plaintiff's theory of the submarginal heart conditions of the pilot and co-pilot, the single finding that there was no probable causal relationship shown between their heart conditions and the accident is ample to meet the requirement of Rule 52(a). The basis of the Court's ruling is clear and an examination of the record will reveal whether there is substantial support for it.
 
 
 12
 The District Court did not, however, comply with Rule 52(a) when it found, without further elaboration, that some of the assumed facts stated in the hypotheticals were not proven. But for the Court's further assuming the validity of all the facts in the hypotheticals for purposes of testing whether the defendant, even under those circumstances, was guilty of wilful misconduct, the failure to elaborate on the inadequacy of the hypotheticals would have been a fatal defect requiring a remand. The Court did find, however, that assuming the accuracy of the facts in the hypotheticals, plaintiff's expert witnesses, Glickstein, Kepner and Cann, drew a conclusion therefrom as to the probable cause of the accident that was not believable. Considerable effort was exercised by the Court in analyzing the basis for the refusal to accept their conclusion. Such elaboration qualifies the finding as sufficient under Rule 52(a), if indeed a specific finding by the trier of fact is needed when the issue is one of credibility.
 
 
 13
 As to the District Court's finding that jet aircraft in or near the ILS glide slope interfered with the Eastern constellation and, therefore, defendant was not guilty of wilful misconduct, this states a fact susceptible of examination by an appellate court and thus is in compliance with Rule 52(a).
 
 
 14
 As an initial matter we conclude, therefore, that the requirements of Rule 52(a) have been sufficiently met.[11] The findings of fact and conclusions of law may now be considered in the light of plaintiff-appellant's appeal contentions.
 
 
 15
 — II —
 
 
 16
 Appellant now concedes the international nature of the flight and to this extent the applicability of the Warsaw Convention. It is contended for the first time, however, that the litigants to this suit, as well as most courts which have previously dealt with the question of liability under the Warsaw Convention, have labored under a misconception concerning the scheme of the Convention. Appellant urges a theory of unlimited absolute liability in the face of the appellee's alleged failure to comply with Article 3(1) of the Convention. It is argued that Article 17[12] provides for unlimited absolute liability unless a carrier proves that it has complied with Article 3(1). Appellee, urges appellant, having failed to carry its burden of proof is, as a matter of law, liable without fault for the total amount of appellant's damages, under Article 17 of the Convention. Specifically, appellant contends that appellee has failed to prove both actual delivery of the ticket to the decedent and actual delivery of an adequate ticket showing (1) all agreed stopping places and (2) the provisions of the Convention which limit a carrier's liability. Although appellant's contention is that the burden of proof is on the carrier, an attempt is also made by appellant to affirmatively show the inadequacy of the ticket, although not the failure to actually deliver that ticket. However, failing acceptance of this approach, appellant urges that the District Court's finding of no wilful misconduct by the appellee was clearly erroneous.
 
 
 17
 Appellee contends that the issue of compliance with Article 3(1) of the Convention was eliminated from the case at pre-trial and that, nevertheless, a plaintiff, and not a carrier-defendant, has the burden of proving non-compliance with Article 3(1). Actual non-delivery of the ticket under Article 3(2) is also urged as the only Article 3(1) conduct of a carrier which will defeat the Convention as a defense. As to the question of wilful misconduct, appellee urges that there was substantial basis for the District Court's exonerating it therefrom. Appellee furthermore cross-assigns as error the District Court's grant of the motion for a new trial subsequent to the jury verdict in its favor at the fourth trial, which resulted in the fifth trial from which this appeal has been taken.
 
 
 18
 The contentions thus having been outlined, we now turn to their disposition.
 
 
 19
 — III —
 
 
 20
 Appellant has urged that both Grey v. American Airlines[13] and Westminster Bank v. Imp. Airways, Ltd.[14] stand for the proposition that liability under Article 17 of the Warsaw Convention, as an initial matter, is absolute and unlimited. To avoid such liability a carrier must demonstrate compliance with Article 3(1) of the Convention, argues appellant. Neither case supports the proposition, for the question of whether Article 17 provides such unlimited absolute liability for the death of a passenger was not an issue therein. Furthermore, in the first appeal before this court, Judge McLaughlin, though not faced squarely with the issue as here raised, in effect disposed of it by appropriately reading Articles 17 and 22(1)[15] in pari materia. It was thus stated:
 
 
 21
 "* * * The Warsaw Convention provides, inter alia, that the carrier is absolutely liable for all injuries where the accident causing the damage so sustained took place on board the aircraft. Article 17. In such circumstances the liability of the carrier for each passenger is limited to 125,000 francs (approximately $8300). Article 22(1). * * *"[16]
 
 
 22
 Article 17 itself gives no indication of the extent of a carrier's liability. It must be read with Article 22(1) for the question concerning the extent of the liability to be answered, and an analysis of the question does not support absolute unlimited liability as the scheme of the Convention.
 
 
 23
 Having thus disposed of this contention, appellant must sustain either (1) its argument that the District Court erroneously found that the appellee was free from wilful misconduct or (2) its argument that there had not been compliance with Article 3(1) of the Convention. Success of the latter argument would have removed the Convention defense of limited liability and allowed the suit to proceed to trial, with the plaintiff's burden being merely to prove the negligence of the defendant, rather than wilful misconduct, this approach being the appropriate substitute for appellant's urged absolute and unlimited liability without fault theory.
 
 
 24
 Such contention, revolving around a construction of Article 3(1), raises the more specific issues of (a) which party has the burden of proof to show compliance or a failure thereof, (b) whether the issue as framed by appellant was eliminated at pre-trial, (c) whether the record before us is sufficient to allow us to dispose of the merits of the mixed questions, and (d) if the record is ample, whether appellee has complied with Article 3(1) and what are the legal ramifications if it has not done so.[17]
 
 
 25
 Appellant submits that its position relative to Article 3(1) must be sustained, that it proved negligence, and that, therefore, this court should remand for entry of judgment in the amount of $375,000 as found by the District Court. The District Court, however, as well as finding that appellee was not guilty of wilful misconduct, found that appellee was not even negligent. If this conclusion is supportable, it is final and there is no need for us to examine appellant's legal contentions concerning Article 3(1) of the Convention, which we have set forth in the foregoing paragraph, for even if those contentions are determined in favor of appellant, they would not dictate a reversal.
 
 
 26
 The issues of appellee's wilful misconduct and negligence are bound together in this case, for appellant's theories of the cause of the accident would have been the basis for proving both, and the burden of such proof as to both remained with appellant as plaintiff.[18]
 
 
 27
 As to appellee's theory that jets entered the ILS glide slope of the Eastern constellation, and the District Court's acceptance of it as the probable cause of the accident, it appears that the evidence supporting it is exceedingly thin. It is unnecessary in this instance to finally resolve whether such a finding is supported by substantial evidence in the record for, even absent such a finding, we are satisfied that the record supports the District Court's conclusion that appellant failed to prove conduct of the appellee that was either wilful or negligent, and the proximate cause of the accident. Such independent proof would have been essential to appellant's recovery.
 
 
 28
 Though medical deficiencies of the pilot and co-pilot were demonstrated, the District Court chose not to draw an inference from this fact that a triggering of known physical disabilities was the cause of the air mishap. It had the right as the trier of fact to refuse to draw such an inference. As there was no other evidence introduced to show either a physical malfunction of the pilot or co-pilot or that such a malfunction was the probable cause of the accident, the District Court's finding that this theory could not be sustained as the probable cause of the accident is not clearly erroneous.
 
 
 29
 Appellant's alternative theory that the pilot knowingly attempted an illegal "sneak-in" below the cloud ceiling in violation of minimal altitude requirements rested solely on the answers to hypothetical questions put to three expert witnesses by appellant. Appellant's experts' answers to the hypotheticals all concluded that the pilot must have been attempting the theorized illegal "sneakin". Appellee's experts testified that it was not possible to draw such a conclusion from the hypothetical facts. The District Court chose not to believe appellant's experts. Its impression of appellant's experts as stating overly partisan, highly speculative, and unqualified opinions was a permissible determination of credibility by the fact finder. Thus, as the testimony of the expert witnesses was the only basis for appellant's "sneak-in" theory, the District Court's refusal to believe it, particularly in the light of contrary expertise, was well within its province as fact finder.
 
 
 30
 The initial observation of the District Court that the evidence as to causation was meager and incomplete would appear to have substantial support in the record. Its conclusion that the evidence was not sufficient for the appellant, as plaintiff, to have sustained the requisite burden of proof on the question of appellee's wilful misconduct or negligence was not clearly erroneous. The resolution of this issue which is fundamental to the litigation, against appellant, precludes the necessity for our determining the numerous subsidiary issues it has raised, as noted heretofore.[19]
 
 
 31
 The District Court entered judgment in favor of appellant, but for the limited Convention liability of $8300. Appellee did not contest this entry of judgment. Indeed, it tendered the $8300 prior to judgment and has taken no cross-appeal. The judgment of the United States District Court for the Eastern District of Pennsylvania of September 30, 1964 will, therefore, be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Article 22(1) of the Convention for the Unification of Certain Rules Relating to International Transportation by Air (Warsaw Convention), 49 Stat. 3014, 3019 (1936) states:
 "In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs. * * *"
 
 
 [2]
 Article 25(1) of the Warsaw Convention, 49 Stat. 3014, 3020 (1936) provides:
 "The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct."
 
 
 [3]
 Berguido v. Eastern Air Lines, 317 F.2d 628, rehearing denied, 317 F.2d 633 (3 Cir.), cert. denied, 375 U.S. 895, 84 S.Ct. 170, 11 L.Ed.2d 124 (1963)
 
 
 [4]
 Berguido v. Eastern Air Lines, Inc., 35 F.R.D. 200 (E.D.Pa.1964)
 
 
 [5]
 Eastern Air Lines Inc. v. Clary, No. 14940, 3 Cir., June 18, 1964
 
 
 [6]
 Eastern Air Lines, Inc. v. Clary, No. 14940, 3 Cir., July 10, 1964
 
 
 [7]
 Defendant conceded that it could not sustain its burden of proof under Article 20 (1) of the Warsaw Convention which states:
 "The carrier shall not be liable if he proves that he and his agents have taken age or that it was impossible for him or all necessary measures to avoid the dam-them to take such measures." 49 Stat. 3014, 3019 (1936).
 
 
 [8]
 Plaintiff contends that Article 3(1) of the Convention, 49 Stat. 3014, 3015 (1936) enumerates the conditions precedent to the applicability of the Convention and that the failure of the defendant carrier to so comply both removes the Convention as a defense and places the burden on plaintiff merely of proving negligence. Article 3(1) provides:
 "(1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:
 "(a) The place and date of issue;
 "(b) The place of departure and of destination;
 "(c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character;
 "(d) The name and address of the carrier or carriers;
 "(e) A statement that the transportation is subject to the rules relating to liability established by this convention."
 Article 3(2) provides further, however, that:
 "The absence, irregularity, or loss of the passenger ticket shall not affect the existence of the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability."
 
 
 [9]
 Berguido v. Eastern Air Lines, Inc., 35 F.R.D. 200, E.D.Pa., Sept. 30, 1964
 
 
 [10]
 5 Moore, Federal Practice § 52.06[1], at 2653 (2d ed. 1951)
 
 
 [11]
 The failure of the District Court to discuss the issue of defendant's complying with Article 3(1) of the Warsaw Convention, supra note 8, seems to be due to its understanding of the pre-trial limitation of the issues. This problem will be discussed and disposed of below in a different context, however, and need not further clutter the issue of the Court's compliance with Rule 52(a)
 
 
 [12]
 Article 17, 49 Stat. 3014 3018 (1936) reads:
 "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."
 
 
 [13]
 227 F.2d 282 (2 Cir. 1955)
 
 
 [14]
 2 All E.R. 890 (K.B.1936)
 
 
 [15]
 Supra note 1
 
 
 [16]
 Berguido v. Eastern Air Lines, supra note 3 at 629 of 317 F.2d
 
 
 [17]
 For discussions of the legal consequences of a failure to comply see Mertens v. Flying Tiger Line, Inc., 341 F.2d 851 (2 Cir. 1965); Grey v. American Airlines, supra note 13 at 284 affirming 95 F. Supp. 756 (S.D.N.Y.1950); Lisi v. Alitalia-Linee Aeree Italiane, 253 F.Supp. 237 (S.D.N.Y.1966)
 It is in passing noteworthy that in Mertens the plaintiff had assumed that the burden was upon him to prove defendant's failure to comply with Article 3(1).
 
 
 [18]
 Grey v. American Airlines, supra note 13 at 285-286
 
 
 [19]
 This disposition also makes it unnecessary to consider appellee's cross-assignment of error concerning the District Court's grant of appellant's new trial motion subsequent to the fourth trial and the jury verdict in appellee's favor
 
 
 
 32
 BIGGS, Chief Judge (concurring).
 
 
 33
 I concur in the result reached by Judge Forman and in all that he has said save for one statement. His opinion states: "As to appellee's theory that jets entered the ILS glide slope of the Eastern constellation, and the District Court's acceptance of it as the probable cause of the accident, it appears that the evidence supporting it is exceedingly thin." I shall not discuss the evidence that formed the basis for the District Court's acceptance of the theory that jets entered the ILS glide slope of the Eastern constellation since it is not relevant to the decision of this case, but I cannot agree with Judge Forman's statement that the evidence supporting such a theory is "exceedingly thin".
 
 
 34
 KALODNER, Circuit Judge (dissenting).
 
 
 35
 I would reverse the Judgment of the trial court and remand with directions to grant a new trial for these reasons:
 
 
 36
 1. Inconsistent fact-findings were made by the trial court on the score of the defendant's negligence; it expressly found that the plane crash was due to a sudden emergency created by "the highly probable presence and actions of jet aircraft" and that as a consequence the defendant was free of all fault or negligence, and then, in awarding $8300 damages to the plaintiffs, it implicitly found that the defendant was negligent since such an award could only have been made under the Warsaw Convention on a finding of negligence. It is settled that where fact-findings are inconsistent either with one another, or with the verdict, that a new trial must be granted. Freightways, Inc. v. Stafford, 217 F.2d 831, 835 (8 Cir. 1955); Rule 49(b) Federal Rules of Civil Procedure.
 
 
 37
 2. The trial court's fact-finding that the crashing of the plane was due to a sudden emergency created by "the highly probable presence and actions of jet aircraft" was against the overwhelming weight of the evidence; it could not have been reasonably made under the evidence.
 
 
 38
 3. The stated fact-finding as to the "probable" presence of jets was clearly on its face speculative. It is settled that "mere speculation" cannot "be allowed to do duty for probative facts." Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943); Noel v. United Aircraft Corporation, 342 F.2d 232, 239 (3 Cir. 1965).
 
 
 39
 4. The trial court erred as a matter of law in ruling that the explicit testimony of plaintiffs' witnesses — airport control tower operators and naval and air force officers — that jets were not present at the time of the crash, was negative proof which "did not balance or outweigh the affirmative testimony" of the defendant's witnesses that they saw and heard jets. It is settled that where a witness is so circumstanced that he is able to testify as to nonpresence of a thing, his testimony is affirmative: Eiseman v. Pennsylvania R. Co., 151 F.2d 222 (3 Cir. 1945); Enfield v. Stout, 400 Pa. 6, 161 A.2d 22 (1960); Wigmore on Evidence, (3rd ed.) 777 § 664.
 
 
 40
 5. The trial court's expressed admission that "The actual cause of the crash of Flight 642 cannot be determined on the record before me" evidenced a "hung-jury" situation which required it to abstain from reaching a verdict and to direct a new trial. Where a jury cannot reach a verdict as to how an accident happened it is a "hung-jury". The trial court, to which the case was tried without a jury, was a "jury". Allen v. St. Louis Nat. Bank, 120 U.S. 20, 30, 7 S.Ct. 460, 30 L.Ed. 573 (1887).
 
 
 41
 The majority has not adverted to any of the stated points nor does its opinion indicate an awareness of their existence.
 
 
 42
 It has confined its consideration to the single point as to whether the record supports the trial court's finding that the defendant "was not even negligent", and has found on that score that "the record supports the District Court's conclusion that appellant [plaintiffs] failed to prove conduct of the appellee [defendant] that was either wilful or negligent, and the proximate cause of the accident", and "Such independent proof would have been essential to appellant's recovery". (emphasis supplied)
 
 
 43
 The majority has by-passed resolution of the critical question as to whether the evidence supports the trial court's finding that the accident was caused by a sudden emergency due to the "probable presence and actions of jet aircraft", even though it concedes that the evidence as to the presence of jets "is exceedingly thin", for the assigned reason that the plaintiffs failed to meet their burden to prove even negligence.
 
 
 44
 The majority errs in its view that the plaintiffs bore the burden to prove negligence.
 
 
 45
 The Warsaw Convention, 49 Stat. 3000 et seq., provides in Article 17[1] that where a passenger is killed or injured aboard a plane "the carrier shall be liable for damage sustained", and Article 20(1)[2] imposes the burden on the carrier to prove that it has "taken all necessary measures to avoid the damage or that it was impossible" for it to take them. We specifically noted these provisions when the instant case was before us on a prior appeal. Berguido v. Eastern Air Lines, Incorporated, 317 F.2d 628, 629 (3 Cir. 1963).[3] It is undisputed that Article 17 "creates a presumption of liability from the happening of the accident."[4] The late Secretary of State Hull, in a letter dated March 31, 1934, addressed to the President, recommending adherence to the Convention, pointed out that Article 17 of the Convention creates a presumption of negligence against the carrier.[5]
 
 
 46
 The majority errs in the further respect that in holding that "the record supports the District Court's conclusion that appellant failed to prove conduct of the appellee that was either wilful or negligent", it disregards the hard fact that the trial court did find the defendant negligent when it returned a verdict of $8300 against the defendant. As earlier stated, such an award could only be made under the Warsaw Convention when a carrier is negligent.
 
 
 47
 The fact of the matter is that the defendant has not on this appeal challenged the finding of negligence implicit in the $8300 award; to the contrary, it seeks affirmance of that award.
 
 
 48
 Moreover, the defendant stresses in its brief that the issue of negligence was not even at issue at the trial; that the only issues were the defendant's wilful misconduct and the applicability of the liability limitations of the Warsaw Convention.
 
 
 49
 What has been said brings us to the consideration of the trial court's factfindings that the "presence and action of jet aircraft" during the plane's landing maneuvers "threatened or interfered with the approach of Flight 642, bringing about emergency conditions and accident resulting in the crash without willful misconduct, negligence or fault on the part of the defendant or any member of the crew of Flight 642"; and that the plane's crew had not "under other than emergency conditions knowingly and intentionally brought the plane to a position below the minimums prescribed for an ILS approach."
 
 
 50
 Discussion of the evidence relating to the presence or action of jets must be prefaced by a brief statement of the plaintiffs' contentions with respect to the crashing of the plane, and the scope of our review of the trial court's fact-finding that jets created a sudden emergency.
 
 First as to the plaintiffs' contentions:
 
 51
 One of the two[6] alternative theories presented below by the plaintiffs as to the issue of defendant's wilful misconduct, was that the plane crashed while it was attempting a "sneak-in" landing, viz., dropping down through a low cloud ceiling into a position below the authorized Instrument Landing System (ILS) approach minimum in violation of Civil Air Regulations. The majority concedes that such a "sneak-in" maneuver would constitute not only negligence but wilful misconduct as well and I agree.
 
 
 52
 Second, as to the scope of our review as to the trial court's fact-findings with respect to jets:
 
 
 53
 The defendant's evidence as to the presence of jets was presented below on depositions. The defendant's evidence as to the nonpresence of jets was also presented on depositions, with but one exception. It is settled that under such circumstances this Court can review and evaluate a finding based on deposition testimony free of the impact of the "clearly erroneous" rule. Mobil Tankers Company, S. A. and Socony Oil Company, Inc. v. Mene Grande Oil Company, 363 F. 2d 611, 613 (3 Cir. 1966)[7] and the cases therein cited.
 
 
 54
 Coming now to the testimony as to the presence or nonpresence of jets which must be considered in the light of the undisputed fact that the only jets in existence at the time of the plane crash here involved were naval and military jets:
 
 
 55
 The defendant's testimony as to the presence of jets was adduced in the depositions of three witnesses.
 
 
 56
 Donald Wheeler said in his deposition that he saw "a silhouette of what looked to be two jets" and heard the sound of jets while he was driving his truck near the Airport at the time of the crash; he walked over to the burning plane but did not report his "observation to anyone at the scene of the accident"; he, however, told his father-in-law, an employee of the defendant, about it the next day.
 
 
 57
 Mrs. Marian A. Farrish said in her deposition that she lived a 20-minute drive from the crash; she heard but did not see a commercial aircraft and jets; she could not explain why in her earlier testimony before the Civil Aeronautics Board she had testified that she heard only jets and not any other type plane.
 
 
 58
 Mrs. Fred Lubin said in her deposition that she lived two miles from the Airport; she heard but did not see both a passenger plane and a "jet or jets" just before the accident.
 
 
 59
 The plaintiffs' testimony as to the jet issue was as follows:
 
 
 60
 Rear Admiral John Francis Greenslade testified in his deposition that in January 1956 he was a Captain of the United States Navy, and Director of Flight Service Division in the Office of Chief of Naval Operations; at the request of the Chief of the Investigation Division of the Civil Aeronautics Board he made a check to ascertain whether there were any Navy jets aloft in the vicinity of Jacksonville, Florida between 12 A.M. and 6 A.M. December 21, 1955 (the crash occurred at 3:41 A.M. December 21, 1955); he made the check requested and found that at the specified period no naval jets were in operation in the area of Jacksonville.
 
 
 61
 Major Robert J. Tobin of the United States Air Force testified in his deposition that in January 1956 he made a check at the request of the Inspector General and the Civil Aeronautics Board as to whether there were any military jets aloft in the vicinity of Jacksonville at the time of the crash and ascertained that there were neither military nor naval jets.
 
 
 62
 William T. McKinney, employed by the Civil Aeronautics Board as airways operations specialist (tower operator) in the control tower of the Jacksonville Airport, testified in his deposition that he was on duty between midnight and 8 A.M. December 21, 1955, together with Lawrence B. Robison, a control tower operator; he saw no jets or aircraft other than the doomed plane on his radar scope.
 
 
 63
 Robison in his deposition testified to the same effect; moreover, that he neither saw nor heard any jet or aircraft other than the defendant's plane, prior to or at the time of the crash.
 
 
 64
 Carl Alton Anderson, a Jacksonville policeman, testified in his deposition that he was on duty at the Airport at the time of the crash and that he did not "hear a jet aircraft that night".
 
 
 65
 Franklin Cardwell, a National Airlines flight engineer, with some 20 years experience, gave this oral testimony at the trial: he lived across the street from defendant's witness Farrish: he heard one Constellation plane (defendant's plane was a Constellation), and it was the only plane aloft at the time; he was familiar with the sound of jet engines; he did not hear a jet and had there been a jet in the air he would have heard since he was listening; he had testified to that effect at the CAB hearing.
 
 
 66
 The trial court credited the testimony of the defendant's witnesses as to the presence of jets. In doing so it said:
 
 
 67
 "To me, affirmative testimony as to seeing objects and hearing sounds, when unequivocal, reasonable and ringing true to the trier of fact is far more persuasive than testimony that said sights or sounds were not seen or heard by other witnesses having opportunity and occasion to see and hear.
 
 
 68
 "On this subject, the negative testimony in this case, whether taken singly or as a whole, in my mind does not balance or outweigh the affirmative testimony. The testimony of Greenslade and others to the effect that no military jets were reported or recorded as operating in the Jacksonville area at the time, while given full consideration, does not convince me that jet aircraft were not or could not have been seen and heard at the time and place indicated in the testimony of Wheeler, Lubin and Farrish." (emphasis supplied)
 
 
 69
 It is obvious that the trial court cleared the decks, so to say, for its crediting of the testimony of the defendant's witnesses by its erroneous categorization of their testimony as affirmative and the countervailing testimony of the plaintiffs' witnesses as negative.
 
 
 70
 As earlier stated, the trial court erred as a matter of law in categorizing the testimony of the plaintiffs' witnesses as "negative". Also, as already said, the trial court's fact-findings as to the presence of jets was against the overwhelming weight of the evidence of competent and disinterested witnesses and they could not have been reasonably made by a fact-finder.
 
 
 71
 The defendant in its brief[8] candidly admits that the evidence did not "conclusively" prove that the accident was caused by "interference from jet aircraft"; that "no one has yet proved why" the plane crashed; that the cause of the crash was an "unpenetrable mystery"; and that "After Judge Boldt sat through 1200 pages of testimony, read 27 depositions, and examined over 50 exhibits, he decided `The actual cause of the crash of Flight 642 cannot be determined on the record before me. * * *'"[9]
 
 
 72
 The defendant's position here presents a baffling anomaly in another respect, viz., it seeks an affirmance of the trial court's award of $8300 with its implicit fact-finding that the defendant was negligent, in patent disregard of the circumstance that the trial court's factfindings that jets created a sudden emergency which caused the plane crash "without willful misconduct, negligence or fault on the part of the defendant", made it mandatory for the trial court to render a verdict in favor of the defendant under Article 20 of the Warsaw Convention,[10] which absolves a carrier from all liability where a sudden emergency causes an accident.
 
 
 73
 The majority's disposition reflects the same anomaly in that it affirms a judgment based on a finding that a sudden emergency caused the plane crash without wilful misconduct or negligence on the part of the defendant which required rendition of a verdict for the defendant, and at the same time it inconsistently affirms a judgment which awards the plaintiffs $8300 for negligence.
 
 
 74
 In summary, I would reverse the Judgment of the trial court and remand for a new trial because of the inconsistency of fact-findings and verdict; the speculative and clearly erroneous fact-findings as to the jets; the erroneous legal standard applied by the trial court with respect to affirmative and negative evidence, and last, but not least the inescapable fact that this was a "hung-jury" requiring abstention from reaching a verdict and granting of a new trial, inasmuch as the trial judge expressly concluded that "The actual cause of the crash of Flight 642 cannot be determined on the record before me".
 
 
 75
 This must be added.
 
 
 76
 The plaintiffs here contend that the liability limitations of $8,300, absent wilful misconduct, of Article 22(1) of the Convention are inapplicable under Article 3(2) because the defendant failed to deliver a passenger ticket to their decedent which adequately advised him of the limitation of liability provision as required by Article 3(1) (e). Under the cited provisions of Article 3 "* * * the carrier must deliver a passenger ticket which shall contain * * * a statement that the transportation is subject to the rules relating to liability established by this convention."
 
 
 77
 The majority did not dispose of this contention for the assigned reason that it finds, albeit erroneously, that plaintiffs had failed to meet their burden to prove even negligence on the defendant's part.
 
 
 78
 While I, too, do not reach this contention, because of my opinion that a new trial must be granted for the reasons earlier stated, I nevertheless feel constrained to express a view as to it should a new trial be granted, as it should.
 
 
 79
 In the instant case, the passenger ticket, in a footnote on its face[11] stated:
 
 
 80
 "Carriage/Transportation under this Passenger Ticket and Baggage Check, hereinafter called `ticket', is subject to the rules relating to liability established by the Convention for the Unification of Certain Rules Relating to International Carriage/Transportation by Air signed at Warsaw October 12, 1929, if such carriage/transportation is `international carriage/transportation' as defined by said Convention."
 
 
 81
 In a recent case, a similar footnote on a plane passenger ticket was held not to be in compliance with the requirement of the notice provisions of Article 3(1) (e) of the Convention, Lisi v. Alitalia-Linee Aeree Italiane, 253 F.Supp. 237 (S.D. N.Y.1966).
 
 It was there said at page 243:
 
 82
 "The footnotes printed in microscopic type at the bottom of the outside front cover and coupons, as well as condition 2(a) camouflaged in Lilliputian print in a thicket of `Conditions of Contract' crowded on page 4, are both unnoticeable and unreadable. Indeed, the exculpatory statements on which defendant relies are virtually invisible. They are ineffectively positioned, diminutively sized, and unemphasized by bold face type, contrasting color, or anything else. The simple truth is that they are so artfully camouflaged that their presence is concealed.
 
 
 83
 "`Lilliputian typography,' Eck v. United Arab Airlines, Inc., 20 App.Div. 2d 454, 457, n. 2, 247 N.Y.S.2d 820, 824, rev'd on other grounds, 15 N.Y.2d 53, 255 N.Y.S.2d 249, 203 N.E.2d 640 (1964), which must be read through `a magnifying glass,' Warren v. Flying Tiger Line, Inc., 234 F.Supp. 223, 230 (S.D.Cal.1964), aff'd, 352 F.2d 494 (9th Cir. 1965), is at war with the intent of the Convention. This was recognized by our Court of Appeals in Mertens where one of the reasons for precluding the carrier from limiting its liability under the Convention was that the required statement `was printed in such a manner as to virtually be unnoticeable and unreadable * * *.' Mertens v. Flying Tiger Line, Inc., supra, 341 F.2d [851] at 857."
 
 
 84
 I agree with the holding cited.
 
 
 85
 I would go further, and hold that assuming the footnote notice, as framed, was printed in readily discernible manner, that it would not satisfy the plain intent of the Convention that a passenger should be adequately advised by his ticket that the carrier's liability was limited by the Convention to $8,300, absent wilful misconduct on the carrier's part.
 
 
 86
 The rationale of such a holding can be briefly stated. A plane passenger is not put on notice of the $8,300 liability limitation by an abbreviated statement that his carriage "is subject to the rules relating to liability established by the Convention for the Unification of Certain Rules Relating to International Carriage/Transportation by Air signed at Warsaw October 12, 1929. * * *"
 
 
 87
 Passengers on an international flight are not expected to carry with them a copy of the Warsaw Convention. See Lachs v. Fidelity & Casualty Co. of New York, 306 N.Y. 357, 118 N.E.2d 555 (1954), where it was said of a contract of flight insurance:
 
 
 88
 "We all know that a contract of insurance, drawn by the insurer, must be read through the eyes of the average man on the street or the average housewife who purchases it. Neither of them is expected to carry the Civil Aeronautics Act or the Code of Federal Regulations when taking a plane." 118 N.E.2d 558.
 
 
 
 Notes:
 
 
 [1]
 Article 17 of the Warsaw Convention provides as follows:
 "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident causing the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."
 
 
 [2]
 Article 20(1) of the Convention provides:
 "The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures."
 
 
 [3]
 In Berguido v. Eastern Air Lines, Incorporated, 317 F.2d 628 (3 Cir. 1963), Judge McLaughlin, speaking for this Court, said at page 629:
 "The Warsaw Convention provides, inter alia, that the carrier is absolutely liable for all injuries where the accident causing the damage so sustained takes place on board the aircraft. Article 17. In such circumstances the liability of the carrier for each passenger is limited to 125,000 francs (approximately $8,300). Article 22(1). In order to escape that liability, the carrier has the burden of proving that it has taken all necessary measures to avoid the damage or that it was impossible for it to take them. Article 20(1). On the other hand, if the plaintiff sustains his burden of proving that the damage is caused by the `wilful misconduct' of the carrier, `[t]he carrier shall not be entitled to avail himself of the provisions of this convention which exclude [Art. 20(1)] or limit [22(1)] his liability.' Article 25(1)."
 
 
 [4]
 In Komolos v. Compagnie Nationale Air France, 111 F.Supp. 393, 401 (S.D.N.Y. 1952), rev'd on other grounds, 209 F.2d 436 (2 Cir. 1953), cert. den. 348 U.S. 820, 75 S.Ct. 31, 99 L.Ed. 646 (1954), the court stated: "The Convention creates apresumption of liability from the happening of the accident. Art. 17. It gives the carrier complete exoneration from liability if the carrier can prove that it took all necessary measures to avoid the damage." See also Wyman v. Pan American Airways, Inc., 181 Misc. 963, 43 N.Y.S.2d 420, 422 (1943); Ritts v. American Overseas Airlines, Inc., 1949 U.S. Av. 65 (S.D. N.Y.1949).
 
 
 [5]
 Secretary Hull said: "The effect of Article 17 (ch. III) of the Convention isto create a presumption of liability against the aerial carrier on the mere happening of an accident occasioning injury or death of a passenger subject to certain defenses allowed under the Convention to the aerial carrier. 1934 U.S. Av. 240, 243." (emphasis supplied)
 
 
 [6]
 The other alternative theory was that both the pilot and co-pilot had submarginal heart conditions which caused or contributed to the plane's crashing. I agree with the majority's view that the trial court's rejection of this theory cannot be said to be "clearly erroneous"
 
 
 [7]
 We there said "Meneg argues that the lower court's findings of fact are presumptively correct and our right to review them is circumscribed by the `clearly erroneous' rule. This rule is inapplicable in the instant case. Since the matter was presented to the lower court on affidavits without oral testimony the findings of fact are reviewable free of the impact of the rule. * * * We are in as good a position as was the trial court to evaluate the evidence, draw the inferences of which the evidence is reasonably susceptible, and decide the critical questions raised on this appeal". 363 F.2d 613
 
 
 [8]
 Pages 15 and 16, Appellee's Brief
 
 
 [9]
 Para. 4 of the trial court's "firm findings and conclusions"
 
 
 [10]
 See Note 2
 
 
 [11]
 Only the face of the passenger ticket was in evidence